NEW YORK TRUST CO. et al. v. VIRGINIA IRON, COAL & COKE CO. et al.

No. 6056.

Circuit Court of Appeals, Fifth Circuit.

Jan. 15, 1931.

Wm. H. Fleming, of Augusta, Ga., Jesse E. Waid, Wm. Wallace, Jr., and Louis G. Bissell, all of New York City (White & Case, of New York City, and Fleming & Fleming, of Augusta, Ga., Chadbourne, Stanchfield & Levy, William Wallace, Jr., Louis G. Bissell, Jesse E. Waid, and Carlos L. Israels, all of New York City, and William H. Fleming, of Augusta, Ga., on the brief), for appellants.

James M. Hull, Jr., of Augusta, Ga., Lewis C. Williams, of Richmond, Va., Elmer B. Collins, Sp. Asst. to Atty. Gen., and Chas. L. Redding, U. S. Atty., of Savannah, Ga., for appellees.

Before FOSTER and WALKER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge.

This is an appeal from a supplemental decree entered June 17, 1930, by the District Court of the United States for the Southern District of Georgia, instructing the receivers of the Georgia & Florida Railroad Company, defendant, to issue $800,000 of Receivers' Certificates, Series B, subordinate to Series A, an issue previously authorized, but superior to the outstanding first mortgage bonds of the defendant railroad company and the lien of its first mortgage dated November 1, 1926, securing said bonds, and to pledge the Series B certificates with the United States as additional security for a loan of $792,000 made by it in 1921 under section 210 of the Transportation Act of 1920 (41 Stat. 468) to the receivers of the Georgia & Florida Railway Company, a predecessor of defendant railroad company, whose properties were sold under a decree of foreclosure of the superior court of Richmond county, Ga., and acquired by the defendant railroad company under a plan of reorganization then being accomplished.

In 1915 the properties of the Georgia & Florida Railway Company were put into receivership in the superior court of Richmond county, Ga. (with ancillary proceedings in Florida), and that court continued to conduct the property as a railroad common carrier until its decree of foreclosure and sale of October 4, 1926, was carried into effect. Upon authority of the state court's order of January 25, 1921, the receivers obtained a loan of $792,000 from the United States under section 210, and executed to the government as evidence of the loan three notes, aggregating that sum, dated January 31, 1921. As collateral security for the loan, the receivers deposited with the Secretary of the Treasury $800,000 of Series A certificates, issued by the receivers January 31, 1921, as constituting, together with the same amount of Series B certificates, a first lien on all the property in hands of the receivers, subject to the lien of certain divisional mortgages. The notes matured in 1924 and were extended to January 31, 1927, by the Secretary. In 1926, the state court and the Interstate Commerce Commission approved a plan submitted to them for the reorganization of the railway company, which provided for the organization of the defendant railroad company to purchase the property and issue first mortgage bonds, among other purposes, to retire the outstanding certificates of the then receivers, including those pledged to the United States as collateral security for the government loan. By its decree of foreclosure of October 4, 1926, the state court ordered the railroad properties sold, subject among other things to the loan of the government secured by Series A certificates. The notes evidencing the loan were to be, and were in fact, extended until January 31, 1936, by agreement with the Secretary and the receivers, and the government accepted the substitution of $1,100,000 principal amount of the new first mortgage bonds, issued by the new railroad company, in lieu of the receivers' certificates, as collateral security for the extended notes. The foreclosure deed was executed to the purchaser, and a first mortgage executed by it, in which appellant was the trustee, dated November 1, 1926. The foreclosure sale occurred November 22, 1926. The purchaser issued its first mortgage bonds, of which $1,100,000 were exchanged for the Series A certificates, which secured the government loan, and which were surrendered by the Secretary. Upon a creditor's bill the property of the new railroad company, defendant herein, was, on October 19, 1929, again put into receivership in the

court below. The receivers, by petition dated March 21, 1930, sought leave to issue $500,000 certificates Series A, and, to be instructed as to the issuance of an additional $800,000 Series B certificates to be pledged as additional collateral security for the loan to the government, stating that the government had demanded the Series B certificates as a condition to its consent to the issue of Series A certificates. By decree dated May 15, 1930, the court below issued the $500,-000 Series A certificates later increased to $600,000. On June 17, 1930, the court below entered the supplemental decree appealed from, instructing the receivers to issue the $800,000 Series B certificates to be deposited as collateral security additional to the first mortgage bonds to the notes evidencing the government loan, holding that the government had a lien accruing under the loan transaction with old receivers which was prior to the lien of the mortgage bonds. The supplemental decree fixed the lien of the Series B certificates ahead of the first mortgage bonds, and is therefore final and appealable.

The question presented by the appeal is whether the United States, in addition to the lien of the receivers' certificates pledged as collateral to its loan to the receivers, had also a receivers' expense lien, because the proceeds of the government loan were used for administrative expenses by the receivers.

The government contends that such expense lien was created: (1) By the order of January 25, 1921, authorizing the loan, and the issue and pledge of the certificates as collateral to the notes evidencing it, and (2) by the foreclosure decree of the state court of October 4, 1926. The appellant denies there was any lien other than that shown on the face of the certificates.

■ I. The state court had power to create a lien for expenses of its receivers when it authorized the government loan, and to make it a prior lien on the properties of the receivership. Its order of January 25th made no mention of such a lien. Even if, in the absence of any mention, the lien could be implied from the nature of the government's loan and the use made of its proceeds, the order was inconsistent with the reservation of a different and prior lien for the loan to that created for the certificates themselves. The order placed the lien of Series A certificates (those issued for the government) on a parity with Series B certificates of equal amount, which were to be sold to the public, and provided for a first lien for both series, subject, however, to

three issues of divisional bonds. This placed them ahead of the two general bond issues being then foreclosed, but behind the three underlying issues, and on a parity with the B certificates. The express creating by the state court of a different lien from that implied by the law shows that the state court did not intend the implied lien to exist. If the prior implied lien had been intended, there would have been no point in the court's securing the government loan by an inferior security such as were the certificates. The government's expense lien would have been made prior to the underlying mortgages, and to the Series B certificates. When the state court, by its order, created an express lien for the loan different from the expense lien, it conclusively showed its intention not to confer the expense lien. The District Court's supplemental decree places the basis of the prior lien, not on the original order, authorizing the loan and the issue and pledge of the certificates, but on the foreclosure decree of the state court of October 4, 1926; and the supposed right it gave the government to resort to the state court to enforce the collection of the receivers' debt to the government in case of default, by retaking the mortgaged property.

■ II. Did the foreclosure decree provide a lien for the government's loan prior to the first mortgage bonds issued to the purchaser at the foreclosure sale under the Reorganization Plan? Section 6 of the foreclosure decree ordered that the mortgaged properties be sold subject to four underlying divisional mortgages (a, b, c, e,); also to an equipment trust, (d); also to the government loan, secured by Series A certificates, (f); also to Series B and Series AA certificates, (g). Section 11 provided for a forfeiture of the purchase money deposited in case of the purchaser's failure to comply with the court's order as to the terms of purchase. Section 15 required the purchaser in addition to purchase price bid, to pay all obligations, indebtedness, and liabilities of the receivers incurred in operating the railroad, and those prior to the receivership, "upon the Court adjudging the same to be prior in lien or superior in equity to the first mortgage bonds and directing the payment thereof." The sixteenth section provided that if the purchaser failed to pay "any before-mentioned indebtedness or liability," the claimant may apply to the state court to have the claim enforced in the usual way by retaking the mortgaged property from the purchaser and reselling it to satisfy the claim.

. Section 6 and section 16 are the sections relied upon by the government for its expense lien. At the time of the foreclosure there was an indebtedness due from the receivers of $600,000, apart from A, B, and AA certificates. It seems clear that the indebtedness mentioned in section 16 is the indebtedness mentioned in section 15, and not the specific obligations named in section 6, to which the foreclosure sale was made subject.

Section 6 mentioned certain specific classes of debts and obligations, viz., four underlying mortgages, an equipment trust, the government loan, and the Series B and AA certificates. It did not require the purchaser to discharge any of these obligations, but made the foreclosure sale subject to them. Hence section 16 was not pertinent as a remedy, as it was in the case of the indebtedness mentioned in section 15, which was required to be discharged by the purchaser, after having been established as to amount and priority by subsequent order of the state court. The maturity of the government loan was to be extended for nine years. The recapture of the property, if applicable to the government loan, might, therefore, be deferred nine years, which would be hardly feasible. The receivers' indebtedness, named in section 15, was presently payable by the purchaser, when fixed by the state court. The appropriate remedy for claimants, to whose liens the decree left the foreclosure sale subject, was to foreclose their liens, when their claims matured, and not by recapture of the mortgaged property under section 16. It seems clear that this was the purpose of specific enumeration of the specific claims in section 6, and of making the sale subject to them, instead of including them in the general indebtedness of the receivers required to be presently paid in section 15 by the purchaser, in default of which section 16 provided for the retaking by the court of the property. The claims named in section 6 were already fixed and liquidated, and needed no order of the state court fixing the amount and the lien, as provided for in section 15. The words "any before-mentioned indebtedness or liability" in section 16 apply to the indebtedness mentioned in section 15 rather than to the more remote obligations named in section 6. The classes of obligations named in section 6 as unaffected by the foreclosure were intended to be treated differently from the general indebtedness by the Receivers named in section 15. The foreclosure being subject to the obligations named in section 6, the state court would not for them provide a retaking of the mortgaged property, which was only required, as in the case of section 15, if the foreclosure was to be free of (not subject to) the debts, and when, if not paid by the purchaser, the claimants would have no remedy except by recapture of the mortgaged property by the state court.

It is also significant that neither the foreclosure deed, nor the mortgage securing the new bonds, specifically mention the government loan as an obligation, to which the sale was still subject. Evidently the interim delivery to the government of its quota of first mortgage bonds, under the plan of reorganization, made it unnecessary to continue that provision of the state court foreclosure decree into the deed and mortgage. Those items that had not been so provided for were left in each. Further, it would be inconsistent, as well as futile, for the government to accept the first mortgage bonds of the new company and retain a lien prior to the lien of the bonds at the same time. It seems clear that the purchaser complied with terms of the foreclosure decree, as understood by all parties, when it delivered to the government the $1,100,000 of first mortgage bonds and secured from the government the pledged certificates. The market value of the bonds was $875,000, and the government loan $792,000, at the time of delivery.

The state court approved the plan of reorganization October 27, 1926, and authorized its receivers to apply to the Interstate Commerce Commission and the Secretary of the Treasury for the necessary extension and the substitution of first mortgage bonds for the receivers' certificates, October 30, 1926. The plan of reorganization was then approved by the Commission, and the extension and substitution authorized. The foreclosure sale did not occur until November 22, 1926. The Reorganization Plan provided for the issue of first mortgage bonds secured by a first lien mortgage of the new company. The bonds were received by the purchasers and distributed to the public, as being the first mortgage bonds of the new company, and it would be inequitable to the bondholders to subordinate their lien to that of the government, in view of its knowledge of and acquiescence in this representation. If the government understood that it had a lien for its loan ahead of that of the first mortgage bonds, it is hard to see why it would take subordinate lien bonds as collateral to its loan. The final opinion of the District Court is based on the idea that the officials of the government had no more right to re-

lease a prior lien than to make a new loan. If there was no prior lien, the principle would have no application. Even if there was one, it seems that, while the Secretary and the Commission could not make a new loan after the two years, or extend it beyond ·fifteen, they could extend it within the limit and authorize the substitution, for the receivers' expense lien, of first mortgage bonds, just as they did authorize the substitution of first mortgage bonds for receivers' certificates. Each was a substitution of securities, and not the making of a new loan.

We conclude that the state court did not intend by its decree of January 25, 1921, nor by its foreclosure decree of October 4, 1926, to create any lien in favor of the government loan, other than expressed in the certificates, and that it would be inequitable for the government to assert a prior lien to that of the outstanding first mortgage bonds of the new company, after it had approved the plan of reorganization, which put out such bonds as having a first lien on the mortgaged property, and after the government itself had accepted $1,100,000 of the bonds, so issued under the plan and containing such representation.

We think the District Court erred in directing the receivers to issue the certificates to the government, and in making them a prior lien to the first mortgage bonds, and in this respect the decree appealed from is modified, and the cause remanded to the District Court for further proceeding in conformity with this opinion, and it is so ordered.